**Michigan Supreme Court**
**Lansing, Michigan**

# Opinion

Chief Justice:
Clifford W. Taylor

Justices:
Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly
Maura D. Corrigan
Robert P. Young, Jr.
Stephen J. Markman

FILED JUNE 21, 2006

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v                                                                       No. 129269

DELORES MARIE DERROR,

Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellant,

v                                                                       No. 129364

DENNIS WAYNE KURTS,

Defendant-Appellee.

_____

BEFORE THE ENTIRE BENCH

CORRIGAN, J.

In these consolidated appeals, we are called upon to determine whether 11-carboxy-THC, a "metabolite" or byproduct of metabolism created when the body breaks down THC (tetrahydrocannabinol), the psychoactive ingredient of marijuana, is a schedule 1 controlled substance under MCL 333.7212 of the Public

Health Code. We hold that it is. Thus, a person operating a motor vehicle with 11-carboxy-THC in his or her system may be prosecuted under MCL 257.625(8), which prohibits the operation of a motor vehicle with any amount of a schedule 1 controlled substance in the body.

Additionally, in Docket No. 129269, we clarify our decision in *People v Schaefer,* 473 Mich 418; 703 NW2d 774 (2005), and hold that, in a prosecution under MCL 257.625(8), a prosecutor is not required to prove beyond a reasonable doubt that the defendant knew that he or she might be intoxicated. Rather, the prosecutor need only prove that the defendant had any amount of a schedule 1 controlled substance in his or her body. Accordingly, we reverse the judgment of the Court of Appeals and remand both cases to the trial court for further proceedings consistent with this opinion.

## I. FACTUAL BACKGROUND

In Docket No. 129269*,* defendant Delores M. Derror was driving east on snow- and slush-covered M-72 when she crossed into oncoming traffic and collided with another vehicle, killing the front-seat passenger, paralyzing two children in the rear seat, and injuring a third child. The accident occurred at approximately 6:00 p.m. Derror admitted that she had smoked marijuana, at 2:00 p.m., earlier that day. Two blood samples were taken, one at approximately 8:00 p.m. and one at approximately 11:00 p.m. The first blood sample reflected 38 nanograms of 11-carboxy-THC per milliliter, and the second contained 31 nanograms of 11-carboxy-THC per milliliter. Derror was charged with operating

2

a motor vehicle with the presence of a schedule 1 controlled substance in her body, causing death and serious injury, under MCL 257.625(4), (5), and (8). Derror was also charged with possession of marijuana, MCL 333.7403(2)(d).

In Docket No. 129364, defendant Dennis Kurts was stopped at approximately 9:00 p.m. for driving erratically. The officer smelled the odor of alcohol on Kurts. Kurts also had glassy, bloodshot eyes. Kurts admitted consuming two beers. During a pat-down search, the officer found a marijuana pipe in Kurts' pocket. Kurts then admitted that he had smoked marijuana a half-hour earlier. A blood sample was taken at approximately 10:00 p.m. Tests revealed that his blood contained eight nanograms of 11-carboxy-THC per milliliter and 0.07 grams of alcohol per 100 milliliters. Kurts was charged with operating a motor vehicle while intoxicated, third offense, MCL 257.625(9); operating a motor vehicle with the presence of a schedule 1 controlled substance in the body, MCL 257.625(8); and operating a vehicle with a suspended or revoked license, MCL 257.904(3)(a).

Pretrial evidentiary hearings were held in both cases in which expert testimony regarding the characteristics of marijuana, THC, and 11-carboxy-THC was introduced. The Court of Appeals summarized this expert testimony as follows:

> The experts agreed that carboxy THC is a "metabolite," or byproduct of metabolism, created in the human body during the body's biological process of converting marijuana into a water-soluble form that can be excreted more easily. Its presence in the blood conclusively proves that a person ingested THC at some point

3

in time. However, carboxy THC itself has no pharmacological effect on the body and its level in the blood correlates poorly, if at all, to an individual's level of THC-related impairment. In fact, carboxy THC could remain in the blood long after all THC has gone, as THC quickly leaves the blood and enters the body's tissues. [*People v Derror (On Reconsideration)*, 268 Mich App 67, 71-72; 706 NW2d 451 (2005).]

The prosecution expert in *Derror*, Dr. Michelle Glinn, further testified, without dispute:

> THC is taken up into the brain and into fat cells and into other tissues, and it leaves its effects on the brain and central nervous system for quite a while after it's not detectible in the blood any further.
>
> The effects of—it causes chemical changes in the brain, basically, that persist for quite a while. And you can document defects in lab studies of THC beyond the time when it's no longer detectible in the blood.

In discussing the structural differences between THC and 11-carboxy-THC, Dr. Glinn explained, also without dispute, that THC and 11-carboxy-THC are identical except that in 11-carboxy-THC, two oxygen atoms are added to, and three hydrogen atoms are removed from, the eleventh carbon to make it more water soluble and easier to excrete.

Following the evidentiary hearings, the trial courts in both cases determined that the Legislature did not intend to include 11-carboxy-THC as a schedule 1 controlled substance because it has no pharmacological effect on the human body. The trial courts, however, reached divergent results regarding the effect of this conclusion. In *Kurts,* the trial court granted Kurts's motion to dismiss the charge of operating a motor vehicle while under the influence of a schedule 1 controlled

substance in violation of MCL 257.625(8) on the grounds of insufficient evidence. In *Derror*, however, the trial court ruled that, although 11-carboxy-THC is not itself a schedule 1 controlled substance, evidence of 11-carboxy-THC in Derror's blood at the time of testing may be presented to the jury as circumstantial evidence to establish that Derror had THC in her blood at the time of driving.

The prosecutors in both cases appealed to the Court of Appeals, which consolidated the appeals and affirmed the trial courts' rulings that 11-carboxy-THC is not a schedule 1 controlled substance.[1] In *Kurts*, the Court of Appeals also reversed the trial court's dismissal of the MCL 257.625(8) charge, concluding that although only 11-carboxy-THC was found in Kurts's blood, evidence existed from which a jury could conclude that Kurts had THC in his blood at the time that he was driving.[2] The Court of Appeals reached this conclusion because Kurts admitted that he had smoked marijuana one half-hour before he was arrested, and because the expert testimony revealed that the presence of 11-carboxy-THC in a person's body conclusively establishes prior ingestion of THC.

The prosecutors in both cases applied for leave to appeal the Court of Appeals determination that 11-carboxy-THC is not a schedule 1 controlled substance within the meaning of MCL 257.625(8). In Docket No. 129269, the

---

[1] *People v Derror (On Reconsideration)*, 268 Mich App 67; 706 NW2d 451 (2005).

[2] *Id*.

prosecutor also sought leave to appeal the Court of Appeals determination that, in a prosecution involving MCL 257.625(8), a prosecutor must prove that the defendant knew he or she might be intoxicated. We granted both applications and ordered that the cases be submitted together.[3]

## II. STANDARD OF REVIEW

Whether 11-carboxy-THC is a schedule 1 controlled substance under MCL 333.7212 of the Public Health Code for the purpose of MCL 257.625(8) is a matter of statutory interpretation. Statutory interpretation is a question of law that is reviewed by this Court de novo. *People v Schaefer*, 473 Mich 418, 427; 703 NW2d 774 (2005), citing *People v Moore*, 470 Mich 56, 61; 679 NW2d 41 (2004), and *People v Babcock*, 469 Mich 247, 253; 666 NW2d 231 (2003). When interpreting statutes, our goal is to give effect to the intent of the Legislature by applying the plain language of the statute. *People v Koonce,* 466 Mich 515, 518; 648 NW2d 153 (2002).

Whether, in a prosecution involving MCL 257.625(8), the prosecutor must prove beyond a reasonable doubt that the defendant knew that he or she might be intoxicated is also a question of law that we review de novo. *Schaefer, supra* at 427.

---

[3] 474 Mich 886 (2005); 474 Mich 887 (2005).

6

## III. 11-CARBOXY-THC IS A SCHEDULE 1 CONTROLLED SUBSTANCE UNDER MCL 333.7212(1)(d)

MCL 257.625(8), which both Kurts and Derror were charged with violating, prohibits the operation of a vehicle while a controlled substance is present in the body. It provides, in relevant part:

> A person . . . shall not operate a vehicle . . . within this state if the person has in his or her body any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code, 1978 PA 368, MCL 333.7212, or a rule promulgated under that section . . . .

MCL 333.7212(1)(c) specifically lists marijuana as a schedule 1 controlled substance, except for certain exceptions not applicable to these cases.

The term "marijuana" is defined in MCL 333.7106(3) as follows:

> "Marihuana" means all parts of the plant Canabis [sic] sativa L., growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds or resin.

In addition to specifically listing marijuana, MCL 333.7212(1)(d) and (e) provide that the following substances also qualify as schedule 1 controlled substances:

> (d) Except as provided in subsection (2), synthetic equivalents of the substances contained in the plant, or in the resinous extractives of cannabis and synthetic substances, derivatives, and their isomers with similar chemical structure or pharmacological activity, or both, such as the following, are included in schedule 1:

> (*i*) $\Delta^1$ cis or trans tetrahydrocannabinol, and their optical isomers.

7

(*ii*)  $\Delta^6$ cis or trans tetrahydrocannabinol, and their optical isomers.

(*iii*) $\Delta^{3,4}$ cis or trans tetrahydrocannabinol, and their optical isomers.

(e)  Compounds of structures of substances referred to in subdivision (d), regardless of numerical designation of atomic positions, are included.

The Court of Appeals held that 11-carboxy-THC was not a schedule 1 controlled substance under MCL 333.7212(1)(c) because it is not expressly listed in the statute.  The Court of Appeals, however, failed to consider other provisions of the Public Health Code in reaching its conclusion; specifically, the provision that defines marijuana.  While MCL 333.7212(1)(c) does not specifically list 11-carboxy-THC as a schedule 1 controlled substance, it does list marijuana.  As stated above, the Public Health Code includes within the definition of marijuana every compound and derivative of the plant or its seeds or resin.

THC is the main psychoactive substance found in the cannabis plant.  11-carboxy-THC is a metabolite of THC in that it is produced when the body metabolizes THC.  See *Stedman's Online Medical Dictionary*, which defines "metabolite" as "[a]ny product or substrate (foodstuff, intermediate, waste product) of metabolism, especially of catabolism."[4]   The question presented before us is whether 11-carboxy-THC is also a derivative of THC.

---

[4] <http://www.stedmans.com/section.cfm/45> (accessed March 8, 2006).

8

We hold that the term "derivative" encompasses metabolites. We construe "all words and phrases . . . according to the common and approved usage of the language," but give terms of art and "technical words and phrases" any "peculiar and appropriate meaning" ascribed by the Legislature or acquired in common usage in the absence of legislative definition. MCL 8.3a; *Schaefer, supra* at 435. In the context of this case, the term "derivative" is a scientific term, definable only by reference to scientific dictionaries.

Medical dictionaries have defined the term "derivative" in a variety of ways. *Stedman's Online Medical Dictionary* defines a "derivative" as "[s]omething produced by modification of something preexisting," or "[s]pecifically, a chemical compound that may be produced from another compound of similar structure in one or more steps, as in replacement of H by an alkyl, acyl, or amino group."[5] Under the first part of this definition, 11-carboxy-THC qualifies as a derivative because it is produced when the body breaks down or naturally modifies THC. 11-carboxy-THC also qualifies as a derivative under the second part of this definition because it is a chemical compound produced when the body metabolizes THC, which is a compound of similar structure. It is undisputed that THC and 11-carboxy-THC are identical except that in 11-carboxy-THC, two oxygen atoms are added to and three hydrogen atoms are removed from the eleventh carbon to make it more water soluble and easier to excrete.

---

[5] <http://www.stedmans.com/section.cfm/45> (accessed March 8, 2006).

*Merriam-Webster's Online Medical Dictionary* defines a "derivative" as "something that is obtained from, grows out of, or results from an earlier or more fundamental state or condition," or "a chemical substance related structurally to another substance and theoretically derivable from it," or "a substance that can be made from another substance."[6] The first and third parts of this definition are as broad as the one from *Stedman's* and would include 11-carboxy-THC because it is produced from THC; it results from the metabolization of THC. The second of the three parts of this definition, however, is more limited in that it includes only "a chemical substance related structurally to another substance . . . ." 11-carboxy-THC also fits within this definition because, as stated above, it has an identical chemical structure to THC except for the eleventh carbon atom.

Defendants agree that 11-carboxy-THC potentially qualifies as a derivative under the above definitions, but contend that defining the term "derivative" broadly under the Public Health Code would produce nonsensical results because it would include almost every chemical substance, including carbon dioxide, which is also a metabolite of THC. We agree that most of the above definitions of "derivative" would encompass metabolites such as carbon dioxide. Not all of the above definitions, however, do so. The second part of the *Merriam-Webster's Online Medical Dictionary* describes a "derivative" as a "chemical substance

---

[6] <http://www2.merriam-webster.com/cgi-bin/mwmednlm> (accessed March 8, 2006).

related structurally to another substance and theoretically derivable from it." This definition seems to include 11-carboxy-THC as a derivative of THC because it is related structurally to THC, but the definition is not so broad as to include other metabolites such as carbon dioxide.

Given these divergent definitions, we must choose one that most closely effectuates the Legislature's intent. *Stanton v Battle Creek*, 466 Mich 611, 618; 697 NW2d 508 (2002).[7] In doing so, we apply the definition of the term

_____

[7] The dissent criticizes our choice of the definition of derivative that most closely effectuates the intent of the Legislature, claiming that because more than one definition exists, the term is ambiguous. Contrary to the dissent's contention, however, a word is not ambiguous merely because different dictionary definitions exist. *Twichel v MIC Gen Ins Corp*, 469 Mich 524, 535 n 6; 676 NW2d 616 (2004), citing *Koontz v Ameritech Services, Inc*, 466 Mich 304, 317-318; 645 NW2d 34 (2002). Moreover, in *Stanton*, Justice Cavanagh used the very principles we use today to define "motor vehicle," a term in which varying dictionary definitions existed. He stated:

It is possible to find varying dictionary definitions of the term "motor vehicle." For example, the *Random House Webster's College Dictionary* (2001) defines a "motor vehicle" as "an automobile, truck, bus, *or similar* motor-driven conveyance," a definition that does not include a forklift. In our view, this definition appropriately reflects the commonly understood meaning of the term. *The American Heritage Dictionary* (2d College ed), on the other hand, defines "motor vehicle" as "self-propelled, wheeled conveyance that does not run on rails," a definition, which would arguably include a forklift. Given these divergent definitions, we must choose one that most closely effectuates the Legislature's intent. Fortunately, our jurisprudence under the governmental tort liability act provides an answer regarding which definition should be selected. As previously noted, it is a basic principle of our state's jurisprudence that the immunity conferred upon governmental agencies and subdivisions is to be construed broadly and that the statutory exceptions are to be

(continued…)

11

"derivative" as defined in the second part of the *Merriam-Webster's Online Medical Dictionary*. As stated above, this definition includes 11-carboxy-THC as a derivative of THC because it is related structurally to THC, but is not so broad as to include other metabolites such as carbon dioxide. Moreover, this definition is consistent with the purpose of the Public Health Code to protect the health, safety, and welfare of the people of this state.[8]

The Court of Appeals further held, and the dissent agrees, that 11-carboxy-THC was not a schedule 1 controlled substance because it has no pharmacological effect on the human body. Contrary to the Court of Appeals holding and the

---

(…continued)

> narrowly construed. Thus, this Court must apply a narrow definition to the undefined term "motor vehicle." [*Stanton, supra* at 617-618 (citation omitted).]

In choosing which definition of the term "derivative" is most appropriate here, we do not use our own "personal beliefs," as suggested by the dissent. Rather, we use the plain language of the statute to divine the Legislature's intent.

[8] The dissent contends that we conclude that 11-carboxy-THC is a derivative of THC because both substances look similar in structure. It further contends that we reach our conclusion by relying on an area of science in which experts do not even agree instead of relying on the plain language of the statute. To the contrary, we conclude that 11-carboxy-THC is a derivative of THC because it is related structurally to THC and is derivable from THC. See *Merriam-Webster's Online Medical Dictionary*. We do not rely on expert testimony in reaching our conclusion. Rather, we rely on the plain language of the statutes in question. Specifically, we rely on MCL 333.7212(1)(c), which lists marijuana as a schedule 1 controlled substance, and MCL 333.7106(3), which defines "marijuana" as including derivatives of the plant. Also, contrary to the dissent's suggestion, although the experts do not agree on all issues in this case, the experts do not dispute that 11-carboxy-THC and THC are nearly identical in structure and that 11-carboxy-THC is derived from the breakdown of THC.

12

dissent's contention, neither MCL 257.625(8) nor MCL 333.7212 requires that a substance have pharmacological properties to constitute a schedule 1 controlled substance. Nor does MCL 257.625(8) require that a defendant be impaired while driving. Rather, it punishes for the operation of a motor vehicle with any amount of schedule 1 controlled substance in the body.[9] The Legislature expressly listed marijuana as a schedule 1 controlled substance. The Legislature expressly included the term "derivative" within the definition of "marijuana." It is not our place to second-guess the Legislature's intent when the language in the statute is plain and unambiguous.[10] *Koonce, supra* at 518. The Legislature undoubtedly has

---

[9] The dissent relies on MCL 333.7211 in concluding that schedule 1 controlled substances must have a pharmacological effect on the human body. It states:

> The administrator shall place a substance in schedule 1 if it finds that the substance has high potential for abuse and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision. [MCL 333.7211.]

This statute, however, is silent with regard to the pharmacological effects of a substance. Rather, it mandates the placement of a substance in schedule 1 if the substance has a high potential for abuse. It does not prohibit the inclusion of other substances in schedule 1. In any event, we note that marijuana has been expressly listed as a schedule 1 controlled substance. Because 11-carboxy-THC is included within the definition of "marijuana" as a derivative, it too constitutes a schedule 1 controlled substance.

[10] The dissent contends that our construction of Michigan's definition of "marijuana" as including 11-carboxy-THC is contrary to and inconsistent with years of federal law. We first note that no federal court has specifically excluded 11-carboxy-THC from the definition of "marijuana." Moreover, the dissent itself points out that the federal courts that have dealt with similar issues have reached

(continued…)

the power to, and often does, criminalize activity that is not itself necessarily dangerous or illegal because it is closely related to activity that is dangerous or illegal.[11]

The Court of Appeals also held that 11-carboxy-THC was not a schedule 1 controlled substance under MCL 333.7212(1)(d) because it is a natural, rather than a synthetic, byproduct of THC. Regardless of whether MCL 333.7212(1)(d) applies to synthetic substances only, 11-carboxy-THC qualifies as a schedule 1 controlled substance under MCL 333.7212(1)(c) and, thus, we need not apply subsection 1(d).

Because 11-carboxy-THC qualifies as a derivative, and since derivatives are included within the definition of marijuana, which MCL 333.7212(1)(c) specifically lists as a schedule 1 controlled substance, we hold that 11-carboxy-

_____

(…continued)
their conclusions by interpreting the legislative history, rather than the plain language of the analogous federal statute. We are not bound by federal precedent in interpreting state law, *Continental Motors Corp v Muskegon Twp*, 365 Mich 191, 194; 112 NW2d 429 (1961), and we decline to adopt the federal precedents the dissent cites when they do not comport with the actual words that our Legislature used to convey its meaning.

Additionally, the Legislature has directed that the statute should not only be construed consistently with applicable federal law, but also "liberally construed for the protection of the health, safety, and welfare of the people of this state." MCL 333.1111(2). The definition employed by the majority meets both directives.

[11] See, for example, MCL 257.624a, in which the Legislature has made it illegal for a driver or passenger of a motor vehicle to transport or possess alcoholic liquor in an open container, regardless of whether the persons in the car actually drink the alcoholic beverage.

14

THC is a schedule 1 controlled substance under MCL 333.7212(1)(c) for the purpose of MCL 257.625(8). We, therefore, reverse the Court of Appeals judgment that held that 11-carboxy-THC is not a schedule 1 controlled substance, and remand both cases to the trial courts for further proceedings consistent with this opinion.

### IV. MCL 257.625(4), (5), and (8) DO NOT REQUIRE PROOF OF A DEFENDANT'S KNOWLEDGE OF HIS OR HER INTOXICATION

In Docket No. 129269, defendant Derror was charged with violating both MCL 257.625(4) and (5), in addition to subsection 8. Subsections 4 and 5 provide for an enhanced sentence for causing death or serious impairment of a body function while operating a motor vehicle with any schedule 1 controlled substance in the body. MCL 257.625 states, in relevant part:

> (4) A person, whether licensed or not, who operates a motor vehicle in violation of subsection (1), (3), or (8) and by the operation of that motor vehicle causes the death of another person is guilty of a crime . . . .

> (5) A person, whether licensed or not, who operates a motor vehicle in violation of subsection (1), (3), or (8) and by the operation of that motor vehicle causes a serious impairment of a body function of another person is guilty of a felony . . . .

> * * *

> (8) A person, whether licensed or not, shall not operate a vehicle . . . if the person has in his or her body any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code . . . .

In interpreting the above provisions, the trial court held that the prosecutor had to prove that Derror's intoxication was a proximate cause of the accident. The

15

Court of Appeals originally affirmed this holding, relying on *People v Lardie,* 452 Mich 231, 256; 551 NW2d 656 (1996), in which this Court held that MCL 257.625(4) "requires the people to prove that a defendant, who kills someone by driving while intoxicated, acted knowingly in consuming an intoxicating liquor or a controlled substance, and acted voluntarily in deciding to drive after such consumption." *Id.* at 256. The *Lardie* Court further noted that "the statute must have been designed to punish drivers when their *drunken* driving caused another's death." *Id.* at 257 (emphasis in original).

We, however, subsequently overruled portions of the *Lardie* case in the companion cases of *People v Schaefer* and *People v Large,* 473 Mich 418; 703 NW2d 774 (2005). In these companion cases we held:

> Section 625(4) plainly requires that the victim's death be caused by the defendant's *operation* of the vehicle, not the defendant's *intoxicated* operation. Thus, the manner in which the defendant's intoxication affected his or her operation of the vehicle is unrelated to the causation element of the crime. The defendant's status as "intoxicated" is a separate element of the offense used to identify the class of persons subject to liability under § 625(4). [*Id.* at 433 (emphasis in original).]

We further held:

> [T]he prosecution, in proving OUIL causing death, must establish beyond a reasonable doubt that (1) the defendant was operating his or her motor vehicle in violation of MCL 257.625(1), (3), or (8); (2) the defendant voluntarily decided to drive, knowing that he or she had consumed an intoxicating agent and might be intoxicated; and (3) the defendant's operation of the motor vehicle caused the victim's death. [*Id.* at 434, citing MCL 257.625(4).]

16

The Court of Appeals granted reconsideration in the *Derror* case in light of our decision in *Schaefer*, and held that the prosecution need only prove that Derror's driving, not her intoxication, was the proximate cause of the accident.[12] The Court of Appeals further held that *Schaefer* applied to both MCL 257.625(4) and (5), although *Schaefer* analyzed subsection 4 only.[13]

We agree with the Court of Appeals application of *Schaefer* in this case to hold that the prosecution need only prove that Derror's driving, not her intoxication, was the proximate cause of the accident. MCL 257.625(8) does not require intoxication or impairment—it simply requires that a person have "any amount" of a schedule 1 controlled substance in his or her body while driving. We further agree that *Schaefer's* holding applies to subsections 4 and 5 alike. The Court of Appeals stated, and we agree, that no reason exists to interpret the identical language of MCL 257.625(5) differently from MCL 257.625(4). We take this opportunity, however, to modify *Schaefer* to the extent that its holding is inconsistent with the plain language of MCL 257.625(4), (5), and (8).

MCL 257.625(4) and (5) punish for the operation of a motor vehicle causing death or serious impairment of a body function in violation of subsections 1, 3, and 8. Here, Derror operated a motor vehicle causing death and serious impairment of body function in violation of subsection 8. *Schaefer* would seem to

_____

[12] 268 Mich App 82.

[13] *Id*. at 81.

17

require the prosecution to prove that Derror voluntarily decided to drive, knowing that she had consumed an intoxicating agent *and might be intoxicated*. The plain language of MCL 257.625(8) does not require the prosecution to prove beyond a reasonable doubt that a defendant knew he or she might be intoxicated. MCL 257.625(8) does not require intoxication, impairment, or knowledge that one might be intoxicated; it simply requires that the person have "any amount" of a schedule 1 controlled substance in his or her body when operating a motor vehicle. We thus clarify *Schaefer* and hold that, in prosecutions involving violations of subsection 8, the prosecution is not required to prove beyond a reasonable doubt that a defendant knew he or she might be intoxicated. Because subsections 1 and 3 are not at issue in this case, we do not disturb our holding in *Schaefer* with regard to these subsections.

## V. RESPONSE TO THE DISSENT

The dissent claims that the majority's interpretation of MCL 257.625(8) is unconstitutional because it: (1) fails to provide notice about what conduct is prohibited, (2) is vague and provides potential for arbitrary and discriminatory enforcement, and (3) is not rationally related to the objective of the statute.

First, the only constitutional issue raised by defendant in his Statement of Questions was that the "expansion" of the definition of "marijuana" rendered the statute unconstitutionally vague and overbroad. Neither party raised the first and third constitutional concerns posed by the dissent. That the justices inquired at oral argument regarding the Legislature's power to enact the statute in question does

18

not preserve these constitutional issues as the dissent suggests. In his dissent in *Mack v Detroit*, 467 Mich 186; 649 NW2d 47 (2002), Justice Cavanagh strongly criticized the practice of raising issues that have never been argued or properly briefed by the parties. He stated:

> In reaching its holding, the majority disregards the foundational principles of our adversarial system of adjudication. As protectors of justice, we refrain from deciding issues without giving each party a full and fair opportunity to be heard. But not for this concern, the judicially created doctrine of standing would be discarded, as it ensures "concrete adverseness which sharpens the presentation of issues upon which the court so largely depends for illumination . . . ." However, the majority has disregarded such considerations, misconstruing the proper scope of its authority, by making dispositive an issue never argued or briefed by the parties. Neither of the parties has had the benefit of sharing with this Court their thoughts on the effect of the tort immunity act on this case, though the implications of the majority's holding are vast. Never before have I witnessed such overreaching conduct from members of this Court. [*Id.* at 213 (Cavanagh, J., dissenting*)* (citation omitted).]

Nevertheless, we will address these unpreserved constitutional issues. First, the dissent claims that our interpretation of the statute does not provide an ordinary person with notice of prohibited conduct. To the contrary, the plain language of the statute is clear and unambiguous. MCL 257.625(8) prohibits the operation of a motor vehicle with any amount of a schedule 1 controlled substance in the body. In essence, the statute prohibits a person from driving after smoking marijuana. It is irrelevant that an "ordinary" marijuana smoker allegedly does not know that 11-carboxy-THC could last in his or her body for weeks. It is also irrelevant that a person might not be able to drive long after any possible

impairment from ingesting marijuana has worn off. The use of marijuana is classified as a misdemeanor under current law, MCL 333.7404(1) and (2)(d). The Legislature's prohibition of the operation of a motor vehicle with *any* amount of marijuana, which explicitly includes derivatives of marijuana, in the body provides more than adequate notice regarding the prohibited conduct. The corollary of this prohibition is that once the schedule 1 substance is no longer in the body, one can resume driving. It is irrelevant that the "ordinary person" cannot determine, without drug testing, when the schedule 1 substance is no longer detectible in the body.

The dissent next argues that our interpretation of the statute is unconstitutionally vague because it provides the potential for arbitrary and discriminatory enforcement. Specifically, it claims that our interpretation of the statute makes criminals of persons who have merely inhaled marijuana or people who are no longer under the influence of marijuana.

As previously stated, MCL 257.625(8) does not require that a person be under the influence of a schedule 1 controlled substance to violate the statute. It merely requires that a person have *any* amount of a schedule 1 controlled substance in the person's body. It is irrelevant that a person who is no longer "under the influence" of marijuana could be prosecuted under the statute. If the

Legislature had intended to prosecute only people who were under the influence while driving, it could have written the statute accordingly.[14]

Moreover, if the general class of offenses to which the statute is directed is plainly within its terms, the statute will not be struck down as vague, even though doubtful cases could be hypothesized. See *United States v Petrillo*, 332 US 1, 5-8; 67 S Ct 1538; 91 L Ed 1877 (1947). In *Petrillo*, the United States Supreme Court stated:

> The Constitution has erected procedural safeguards to protect against conviction for crime except for violation of laws which have clearly defined conduct thereafter to be punished; but the Constitution does not require impossible standards. The language here challenged conveys sufficiently definite warning as to the proscribed conduct when measured by common understanding and practices. The Constitution requires no more. [*Id.* at 7-8.]

In this case, both defendants admitted smoking marijuana just hours before driving. No question exists that that statute proscribes their conduct. Moreover, the statute sufficiently conveyed that operating a vehicle after smoking marijuana is illegal. Because a hypothetical case could be posed where doubts might arise does not render the statute unconstitutionally vague. The statute, as applied to these defendants, is constitutional.

---

[14] The Legislature has included an "under the influence" requirement in other sections of MCL 257.625. See subsections 1 to 3. Thus, if the Legislature had also intended to include the same requirement in subsection 8, it would have done so.

Finally, the dissent contends that our plain language interpretation of the statute does not pass muster under the rational basis test. Initially, we agree that rational basis review is appropriate because the statute is social legislation[15] enacted under the state's traditional police power to regulate public safety, public health, morality, and law and order.[16] Further, under this highly deferential standard of review, the legislation must be upheld unless the challenger can show that it is "'"arbitrary, and wholly unrelated in a rational way to the objective of the statute."'"[17] We reject the dissent's assertion that the statute is not rationally related to its objective.

The dissent claims that the statute's objective is to prevent people from driving under the influence of a controlled substance. Not so. The statute's stated objective is to prevent persons from driving with any amount of a schedule 1 controlled substance in the body, whether or not the substance is still influencing them. This is clearly a legitimate exercise of the Legislature's police power since

---

[15] See *Phillips v Mirac, Inc,* 470 Mich 415, 434; 685 NW2d 174 (2004).

[16] *Berman v Parker,* 348 US 26, 32; 75 S Ct 98; 99 L Ed 27 (1954) ("Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it.").

[17] *Phillips, supra* at 433, quoting *Crego v Coleman,* 463 Mich 248, 259; 615 NW2d 218 (2000), quoting *Smith v Employment Security Comm,* 410 Mich 231, 271; 301 NW2d 285 (1981); see also *Harvey v Michigan,* 469 Mich 1, 7; 644 NW2d 767 (2003).

11-carboxy-THC is indisputably only present in the body after someone has ingested marijuana, i.e., done something illegal.

Nevertheless, assuming that the statute's objective is to prevent persons from driving under the influence of marijuana, the statute passes constitutional muster. While the dissent seemingly concedes that preventing people from driving under the influence of marijuana is a legitimate government objective, it asserts that, under our interpretation, the statute is not rationally related to that objective because 11-carboxy-THC has no pharmacological effect and, therefore, cannot influence the person's driving. That the statute might apply to some persons who are not actually under "the influence" of marijuana does not render the statute unconstitutional. Rather, under the rational basis standard of review, our only inquiry is whether *any* conceivable set of facts, either known or that can reasonably be assumed, even if they are debatable, might support the Legislature's judgment that making it a crime for persons to drive with any amount of 11-carboxy-THC in the body will prevent them from driving under the influence of a controlled substance.[18]

Such a conceivable set of facts certainly exists in this case. It is undisputed that the presence of 11-carboxy-THC conclusively proves that a person, at some point, ingested THC, which is an ingredient in marijuana and which *does* have a

---

[18] *Muskegon Area Rental Ass'n v Muskegon*, 465 Mich 456, 464; 636 NW2d 751 (2001); *Harvey, supra* at 7.

pharmacological effect on the body. It is also undisputed that THC itself begins to break down and leave the bloodstream shortly after entering the body, but that its effects can last long after it is no longer detectible in the blood. It is thus conceivable that the Legislature enacted this statute to further the objective of preventing persons from driving under the influence of marijuana by enabling the prosecution of persons who might be under the influence of THC, but for whom only traces of 11-carboxy-THC, and not THC itself, are still present in the body.

Moreover, under the rational basis test, we do not consider the wisdom of the Legislature's choice, or whether that choice was made with mathematical nicety, or whether it is most narrowly drawn to obtain its objective, or whether it may be inequitable when put into practice.[19] In short, we do not consider the effects of the statute or its consequences, only its purpose.[20] As long as the Legislature's objective is legitimate, the means that it chooses to obtain that objective is not rendered unconstitutional merely because it may be overinclusive.

In *New York Transit Auth v Beazer,* 440 US 568; 99 S Ct 1355; 59 L Ed 2d 587 (1979), the United States Supreme Court upheld a statute applying the rational basis standard. The *Beazer* case involved a challenge to the New York Transit Authority's refusal to employ persons who used methadone, a drug used to cure

---

[19] *Phillips, supra* at 434; *Muskegon Area Rental, supra* at 464; *Harvey, supra* at 7.

[20] *Phillips, supra* at 435, quoting *Duke Power Co v Carolina Environmental Study Group,* 438 US 59, 83-84; 98 S Ct 2620; 57 L Ed 2d 595 (1978).

24

heroin addiction, under a general safety-oriented policy against employing persons who use narcotic drugs. *Id.* at 570-573. The plaintiffs, participants in state-regulated methadone treatment programs who had been denied employment with the transit authority, challenged the blanket exclusion as overinclusive. Specifically, they asserted that the exclusion, at least as applied to them, did not further the policy's goal of safety because methadone administered in such treatment programs does not produce euphoria, is an effective cure for heroin addiction, and frees the majority of persons involved in such programs from illicit drug use. *Id.* at 573-577.

The Court rejected the plaintiffs' challenge. After concluding that the transit authority's blanket exclusion was probably broader than necessary to achieve its goal of ensuring safety, *id.* at 592, the Court stated that "it is of no constitutional significance that the degree of rationality is not as great with respect to certain ill-defined subparts of the classification as it is with respect to the classification as a whole." *Id.* at 593. The same is true here. The goal of the legislation is legitimate. That the Legislature could have conceivably enacted a more perfectly precise statute does not render the current statute constitutionally invalid.[21]

---

[21] Contrary to the dissent's contention, we are not "ignor[ing] [our] mandate to reasonably construe a statute to ensure that it is constitutional . . . ." *Post* at 16 n 5. Our construction of the statute, which is consistent with the plain

(continued…)

## VI. CONCLUSION

We hold that 11-carboxy-THC is a schedule 1 controlled substance under MCL 333.7212(1)(c) of the Public Health Code for the purpose of construing MCL 257.625(8) of the Michigan Vehicle Code. Accordingly, we reverse the judgment of the Court of Appeals regarding this issue, and remand both cases to the trial courts for further proceedings consistent with this opinion. We do not retain jurisdiction.

We reaffirm our holding in *Schaefer* that the prosecution need only prove that a defendant's driving, not his or her intoxication, was a proximate cause of the accident. Further, *Schaefer's* holding applies to both MCL 257.625(4) and (5). Accordingly, we affirm the judgment of the Court of Appeals regarding this issue in Docket No. 129269.

We also modify *Schaefer* to hold that, in a prosecution involving MCL 257.625(8), the prosecutor need not prove beyond a reasonable doubt that the defendant knew he or she might be intoxicated.

> Maura D. Corrigan
> Clifford W. Taylor
> Robert P. Young, Jr.
> Stephen J. Markman

---

(…continued)

language of the statute, does not render the statute unconstitutional. Thus, we need not construe the statute differently.

STATE OF MICHIGAN

SUPREME COURT

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellant,

v                                                     No. 129269

DELORES MARIE DERROR,

     Defendant-Appellee.

_____

PEOPLE OF THE STATE OF MICHIGAN,

     Plaintiff-Appellant,

v                                                     No. 129364

DENNIS WAYNE KURTS,

     Defendant-Appellee.

_____

CAVANAGH, J. (*dissenting*).

Today, the majority holds that 11-carboxy-tetrahydrocannabinol (11-carboxy-THC) is a schedule 1 controlled substance and that a person violates the law if he drives with *any* amount of 11-carboxy-THC in his body. The full import of this decision can only be understood by recognizing that the majority's interpretation means that a person can no longer legally drive a car if scientific

testing can detect *any amount* of 11-carboxy-THC in his system.  This means that weeks, months, and even years after marijuana was ingested, and long after any risk of impairment has passed, a person cannot drive a car without breaking the law if a test can detect the presence of 11-carboxy-THC.  Because I believe that this interpretation disregards the statutory language chosen by the Legislature and results in an interpretation that violates the United States Constitution and the Michigan Constitution, I respectfully dissent.

## 11-CARBOXY-THC IS NOT A SCHEDULE 1 CONTROLLED SUBSTANCE BECAUSE IT IS NOT A DERIVATIVE OF MARIJUANA

This case involves an issue of statutory interpretation, and the primary goal of statutory interpretation is to give effect to the intent of the Legislature. The first step is to review the language of the statute.  If the statutory language is unambiguous, the Legislature is presumed to have intended the meaning expressed in the statute, and judicial construction is not permissible.  *In re MCI Telecom Complaint*, 460 Mich 396, 411; 596 NW2d 164 (1999).   However, when a statute is ambiguous, "so that reasonable minds could differ with respect to its meaning, judicial construction is appropriate to determine the meaning." *Id.*

MCL 257.625(8) states in relevant part:

> A person, whether licensed or not, shall not operate a vehicle upon a highway or other place open to the general public or generally accessible to motor vehicles, including an area designated for the parking of vehicles, within this state if the person has in his or her body *any amount of a controlled substance listed in schedule 1 under section 7212 of the public health code*, 1978 PA 368, MCL 333.7212, or a rule promulgated under that section . . . .  [Emphasis added.]

2

Marijuana itself is a schedule 1 controlled substance.  MCL 333.7212(1)(c).

"Marijuana" is defined as follows:

> "Marihuana" means all parts of the plant Canabis [sic] sativa L., growing or not; the seeds thereof; the resin extracted from any part of the plant; and every compound, manufacture, salt, derivative, mixture, or preparation of the plant or its seeds or resin.  It does not include the mature stalks of the plant, fiber produced from the stalks, oil or cake made from the seeds of the plant, any other compound manufacture, salt, derivative, mixture, or preparation of the mature stalks, except the resin extracted therefrom, fiber, oil or cake, or the sterilized seed of the plant which is incapable of germination.  [MCL 333.7106(3).]

Further, MCL 333.7212(1)(d) states that the following are also schedule 1 controlled substances:

> Except as provided in subsection (2), synthetic equivalents of the substances contained in the plant, or in the resinous extractives of cannabis and synthetic substances, derivatives, and their isomers with similar chemical structure or pharmacological activity, or both, such as the following, are included in schedule 1:
>
> (*i*) $\Delta^1$ cis or trans tetrahydrocannabinol, and their optical isomers.
>
> (*ii*) $\Delta^6$ cis or trans tetrahydrocannabinol, and their optical isomers.
>
> (*iii*) $\Delta^{3,4}$ cis or trans tetrahydrocannabinol, and their optical isomers.

Notably, when construing MCL 333.7212 as part of the Public Health Code, the provisions are "intended to be consistent with applicable federal and state law and shall be construed, when necessary, to achieve that consistency." MCL 333.1111(1).   Michigan's definition of "marijuana" is identical in all

3

relevant portions to the federal definition. See 21 USC 802(16).[1] Yet no federal court has held that 11-carboxy-THC is a schedule 1 controlled substance. As the Seventh Circuit Court of Appeals stated, "The legislative history of the [Controlled Substances] Act indicates that the purpose of banning marijuana was to ban the euphoric effects produced by THC." *United States v Sanapaw*, 366 F3d 492, 495 (CA 7, 2004). Significantly, as every expert who testified in these cases acknowledges, 11-carboxy-THC has *no* pharmacological effects on a person.

Further, the District of Columbia Court of Appeals held that "the definition of marijuana was intended to include those parts of marijuana which contain THC and to exclude those parts which do not." *United States v Walton*, 168 US App DC 305, 307; 514 F2d 201 (1975). Numerous courts have also long held that the statute is intended to outlaw all species of marijuana containing *tetrahydrocannabinol*. See, e.g., *United States v Lupo*, 652 F2d 723, 728 (CA 7, 1981) (emphasis added). Therefore, construing Michigan's definition of

---

[1] The federal statute states:

> The term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination. [21 USC 802(16).]

"marijuana" to include 11-carboxy-THC is contrary to and inconsistent with years of federal law.

While the majority subtly criticizes the federal courts for using legislative history to reach their conclusions, as opposed to the "plain language" of the statute, the majority itself is guilty of ignoring the plain language of MCL 333.1111(1) to reach its conclusion. In MCL 333.1111(1), the Legislature states that provisions of the Public Health Code are intended to be construed *consistently* with applicable federal law. The Legislature did *not* state that the clear mandate to construe provisions consistently with federal law can be ignored when the majority believes that the federal courts have not properly decided the cases before them. Further, the majority's seemingly minor critique of the use of legislative history is actually quite remarkable when one considers that the statutory language at issue in this case—as well as the language in the federal statute—is certainly not plain and unambiguous, no matter how much the majority tries to convince a reader that it is. This is best illustrated by reviewing the majority's approach to interpreting this "plain" language.

To decide this case, the majority recognizes that the term "derivative" needs to be defined, so it consulted scientific dictionaries to do so. The majority found that there were "divergent" definitions of "derivative" to such a degree that the members of the majority had to choose the one they *believed* would best effectuate the Legislature's intent, using nothing to guide them except their

5

beliefs.[2]  Notably, the majority even states that it decided not to follow "most" definitions.  Instead, the majority chooses to ignore most definitions because these definitions would not support the majority's outcome, and the majority ultimately settles on the one definition that would allow it to best support its position.

Simply, contrary to the majority's bold assertions, there is nothing plain or unambiguous about a statute that uses a term with definitions that are so diverse that they can support two totally different outcomes.  In fact, this is the very meaning of the term "ambiguous."  A statute is ambiguous when "reasonable minds could differ with respect to its meaning . . . ." *In re MCI*, *supra* at 411; see also *Perez v Keeler Brass Co*, 461 Mich 602, 610; 608 NW2d 45 (2000) (In a unanimous opinion from this Court, the term "refuses" was deemed ambiguous because it could reasonably be construed narrowly or broadly, resulting in two different meanings and two different outcomes.).  And in cases in which statutory language is ambiguous, such as the case before us, and the cases involving similar language before the federal courts, use of legislative history to try and best effectuate the intent of the Legislature when interpreting unclear and ambiguous statutory language is a better method than an analysis that attempts to divine the

---

[2] The majority consulted medical dictionaries.  A further review of various chemical dictionaries indicates exactly what the majority has stated—there are widely divergent definitions of "derivative" and "metabolite," such that a definition alone cannot resolve this issue.  See, e.g., *Grant & Hackh's Chemical Dictionary* (5th ed); *Glossary of Chemical Terms* (2d ed); *Hawley's Condensed Chemical Dictionary* (12th ed).

6

Legislature's intent using nothing more than the personal beliefs of those in the majority.[3]

Moreover, not only does the majority ignore federal law in its analysis, it also ignores other relevant statutory provisions. To support its outcome, the majority merely cites various sources for the definition of "derivative" and notes that these sources offer divergent definitions. However, the majority resolves this ambiguity by ultimately selecting a definition that describes a derivative as a "'chemical substance related structurally to another substance and theoretically derivable from it.'" *Ante* at 10, quoting *Merriam-Webster's Online Medical Dictionary*. The majority does this because it believes that this definition most closely effectuates the intent of the Legislature.

But the majority ignores other statutory provisions that indicate that 11-carboxy-THC is not a schedule 1 controlled substance. Contrary to the majority's

_____

[3] I note that the majority attempts to create an inconsistency in my position when none actually exists. *Ante* at 11 n 7. The majority references a prior case that I wrote—*Stanton v Battle Creek*, 466 Mich 611; 647 NW2d 508 (2002)—and states that I used the same principles that I criticize the majority for using in this case. However, the majority should read my opinion in *Stanton* more closely. In *Stanton*, I recognized that there were divergent definitions of the term "motor vehicle" and that one should be selected that most closely effectuates the Legislature's intent. I further stated, "Fortunately, our *jurisprudence under the governmental tort liability act provides an answer regarding which definition should be selected*." *Id*. at 618 (emphasis added). In direct contrast to my analysis in *Stanton*, the majority has not used jurisprudence to guide its decision; instead, those in the majority have solely used their personal beliefs about what the outcome of this case should be to guide their decision. As such, the majority has ignored the rules of statutory construction in its effort to arrive at its desired result.

position, MCL 333.7212 does not plainly and unambiguously classify 11-carboxy-THC as a schedule 1 controlled substance. 11-carboxy-THC is not listed anywhere in the statute. The majority rests its entire argument on the use of the word "derivative" in the statute, but this analysis is flawed because the majority reaches a result that dismissively ignores the fact that 11-carboxy-THC has no pharmacological effect on a person. While MCL 333.7211 does not explicitly require that a substance have a pharmacological effect to constitute a schedule 1 controlled substance, the statute does explicitly state that a substance is classified as a schedule 1 controlled substance if it has a high potential for abuse, which naturally requires a pharmacological effect.

Our Legislature has stated that a substance is placed "in schedule 1 if [the administrator] finds that the substance has *high potential for abuse* and has no accepted medical use in treatment in the United States or lacks accepted safety for use in treatment under medical supervision." MCL 333.7211 (emphasis added). But there is no dispute that 11-carboxy-THC has *no* pharmacological effect. All the experts—including experts Dr. Michelle Glinn, who is the supervisor of the toxicology laboratory of the Michigan State Police Crime Lab, and Dr. Felix Adatsi, both called to testify by the prosecution—admit that 11-carboxy-THC has *no pharmacological effect on a person whatsoever*.

Other factors listed by the Legislature to consider in making a determination about the classification of a substance are:

(a) The actual or relative potential for abuse.

8

(b) The scientific evidence of its pharmacological effect, if known.

(c) The state of current scientific knowledge regarding the substance.

(d) The history and current pattern of abuse.

(e) The scope, duration, and significance of abuse.

(f) The risk to the public health.

(g) The potential of the substance to produce psychic or physiological dependence liability.

(h) Whether the substance is an immediate precursor of a substance already controlled under this article. [MCL 333.7202.]

*None* of these factors that are used to determine if a substance should be classified as a schedule 1 controlled substance applies to 11-carboxy-THC. 11-carboxy-THC has *no* pharmacological effect on a person, and, therefore, it has no potential for abuse or potential to produce dependence. Further, as expert witness Dr. Michael Evans testified, it is impossible to take 11-carboxy-THC and make it into THC; therefore, it is not an immediate precursor of a substance already classified as a schedule 1 controlled substance.

Our Legislature selected these factors and the words "high potential for abuse" for a reason—they cannot be ignored by the majority merely because they cannot be reconciled with the majority's rationale. "It is a well-established rule of statutory construction that provisions of a statute must be construed in light of the other provisions of the statute to carry out the apparent purpose of the Legislature." *Farrington v Total Petroleum, Inc*, 442 Mich 201, 209; 501 NW2d

9

76 (1993). "To that end, the entire act must be read, and the interpretation to be given to a particular word in one section arrived at after due consideration of every other section so as to produce, if possible, a harmonious and consistent enactment as a whole." *City of Grand Rapids v Crocker*, 219 Mich 178, 182-183; 189 NW 221 (1922). The majority's analysis ignores the very reasons that a substance is classified as a schedule 1 controlled substance, and it reaches a result that completely disregards other relevant provisions of the statute.

Further, the majority makes pronouncements such as 11-carboxy-THC is a derivative "because it is a chemical compound produced when the body metabolizes THC, which is a compound of similar structure." *Ante* at 9. The majority then states that "THC and 11-carboxy-THC are identical except that in 11-carboxy-THC, two oxygen atoms are added to and three hydrogen atoms are removed from the eleventh carbon atom to make it more water soluble and easier to excrete." *Ante* at 9. But merely because a compound *looks* similar in its basic chemical formula does not mean that it is a compound of similar structure for the purposes of controlled substance classification methods. Water and hydrogen peroxide look similar—$H_2O$ and $H_2O_2$—but they are, of course, very different substances. One is a substance you must drink to survive; the other will kill you if you drink it. Instead of trying to delve into areas of science in which the experts do not even agree, the majority should simply refer to the statutory language and the fact that when considering the factors selected by the Legislature, there is no rationale to classify 11-carboxy-THC as a schedule 1 controlled substance.

10

Incredibly, the majority attempts to present the expert testimony as being in agreement. See *ante* at 12 n 8. Yet this inaccurate representation is not supported when one actually reads and considers the *full* testimony of the experts. The experts are *not* in agreement about whether 11-carboxy-THC is a derivative of marijuana and, therefore, a schedule 1 controlled substance. While the experts may be in agreement over some scientific principles, they disagree over the key issue in this case, and it is misleading to present this in any other manner. Notably, Dr. Daniel McCoy and Dr. Evans both testified that 11-carboxy-THC was a metabolite, but it was not a derivative and, therefore, 11-carboxy-THC was not a schedule 1 controlled substance. As Dr. McCoy explained, under the interpretation adopted by the majority "everything is a derivative, every chemical on earth can be derived from something else." He further explained that, using the majority's interpretation, if THC is burned, "we will develop a lot of chemicals, including carbon dioxide, to the extent a derivative is something that comes from and has similar chemical structure to some part, carbon dioxide would be scheduled material . . . . ." Dr. Evans testified, "It [11-carboxy-THC] is not a derivative. . . . To call carboxy THC a derivative of THC would be like—carbon dioxide is a metabolite of THC. You'll get that when you exhale or take in a breath. . . . If you were to call carboxy THC a derivative, you would have to call carbon dioxide a derivative of THC . . . ." In short, Dr. McCoy and Dr. Evans disagreed with the majority's interpretation because the rationale that would support classifying 11-carboxy-THC as a derivative would also apply to carbon

11

dioxide; therefore, a person could be guilty of violating MCL 257.625(8) with *carbon dioxide* in his system—a result that even the majority finds to be insupportable. Further, the majority even highlights the scientific disagreement when it refers to the divergent definitions for "derivative" and states "that most of the above definitions of 'derivative' would encompass metabolites such as carbon dioxide. Not all of the above definitions, however, do so." *Ante* at 10. Thus, it is false to suggest that this case is one in which the experts agree that 11-carboxy-THC is a derivative of marijuana and, therefore, a schedule 1 controlled substance.

As it pertains to MCL 333.7212(1)(d), the Court of Appeals properly held that the statute was enacted to deal with substances that were produced synthetically. The statute refers to "synthetic equivalents" and "synthetic substances, derivatives, and their isomers with similar chemical structure or pharmacological activity . . . ." MCL 333.7212(1)(d). Synthetic substances are substances that were altered, sometimes in minor ways, but that can still have pharmacological effects on a person. However, 11-carboxy-THC is a metabolite; it is a natural substance that occurs when a person's body breaks down THC, and it is not a synthetic substance. Therefore, 11-carboxy-THC is also not classified as a schedule 1 controlled substance by MCL 333.7212(1)(d). Moreover, in *Hemp Industries Ass'n v Drug Enforcement Admin*, 333 F3d 1082, 1089 (CA 9, 2003), the Ninth Circuit Court of Appeals interpreted a regulation with language similar to that used in MCL 333.7212(1)(d) and held that this regulation was enacted because THC was being produced *synthetically* and should be controlled.

12

Likewise, the comparable statute at issue addresses substances produced synthetically and not those produced naturally through metabolism.

Finally, the Legislature knows how to use the term "metabolite" when it wants to. In MCL 722.623a, the Legislature specifically uses the term "metabolite" in discussing child abuse reporting requirements. The statute specifically refers to "a metabolite of a controlled substance." The Legislature is presumed to be aware of all existing statutes when it enacts another. *Walen v Dep't of Corrections*, 443 Mich 240, 248; 505 NW2d 519 (1993). The fact that the Legislature specifically chose not to include the word "metabolite" is further indication that 11-carboxy-THC should not be classified as a schedule 1 controlled substance under the language selected by the Legislature.

Thus, the majority's interpretation that 11-carboxy-THC is a schedule 1 controlled substance is flawed for numerous reasons. Namely, the interpretation ignores federal case law, the statutory language chosen by our Legislature, and other relevant statutory provisions, as well as the basic tenets of statutory construction. Notably, the majority's unsupportable theory results in an interpretation that is not just analytically flawed but is also unconstitutional.

### THE ISSUE WHETHER THE MAJORITY'S INTERPRETATION OF THE STATUTE IS UNCONSTITUTIONAL IS PROPERLY PRESERVED

The issue whether the majority's interpretation of the statute is unconstitutional has been properly raised and preserved. Contrary to the majority's assertion that the constitutional issue has not been properly preserved,

defendant Derror did sufficiently raise this issue. Defendant Derror's first question presented states, "IS CARBOXY THC, A METABOLITE OF MARIJUANA WITH NO PHARMACOLOGIC EFFECTS, A SCHEDULE 1 CONTROLLED SUBSTANCE?" One of the reasons that defendant Derror argues 11-carboxy-THC is not a schedule 1 controlled substance is that such an interpretation would be unconstitutional. This is explicitly expressed in one of the subheadings addressing this issue, which states, "The Definition Of Marijuana In MCL 333.7106 Does Not Include Carboxy THC. The Unprecedented Expansion Of This Definition, Originally Adopted By The U.S. Congress In 1937, Is Contrary To The Plain Language Of The Statute, Legislative Intent, And Renders The Statute Constitutionally Vague And Overbroad."

Further, defendant Derror's second question presented states, "CAN MCL 257.625(4), (5) AND (8) BE INTERPRETED TO CREATE STRICT LIABILITY CRIMES WITHOUT VIOLATING DEFENDANTS' CONSTITUTIONAL RIGHT TO DUE PROCESS?" In addressing this issue, defendant Derror further explains why classifying 11-carboxy-THC as a schedule 1 controlled substance would violate a person's due process rights. Notably, the prosecutor in *Derror* responded to these arguments in his brief, specifically arguing that Michigan's statute is constitutional because there is a legitimate state interest in proscribing the use of *any* amount of certain controlled substances. Not only was this issue briefed, but Chief Justice Taylor specifically questioned the parties about the constitutionality of the statute during oral argument, as did Justice Young and

14

Justice Markman. Accordingly, the majority's contention that I have strongly criticized the practice of raising issues that have never been argued or briefed by the parties is an accurate statement, but it is *wholly inapplicable to this case*. The parties not only had the opportunity to address the constitutional issue in this case, but *they indeed did so*. The majority misrepresents the record in this case and quotes from a prior opinion that I wrote to try and conjure up an inconsistency in my position when indeed no such inconsistency exists. The issue of constitutionality has been properly raised and preserved, and, as such, I find the majority's interpretation of the statute to be unconstitutional.

THE MAJORITY'S INTERPRETATION OF THE STATUTE IS<br>UNCONSTITUTIONAL

It is indisputable that due process requires that citizens "be apprised of conduct which a criminal statute prohibits." *People v Turmon*, 417 Mich 638, 655; 340 NW2d 620 (1983).[4] "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." *United States v*

---

[4] The Fifth Amendment of the United States Constitution provides in relevant part:

> No person shall . . . be deprived of life, liberty, or property, without due process of law . . . . [US Const, Am V.]
> The Michigan Constitution provides in relevant part:

> No person shall be . . . deprived of life, liberty or property, without due process of law. [Const 1963, art 1, § 17.]

15

*Harriss*, 347 US 612, 617; 74 S Ct 808; 98 L Ed 989 (1954). No person "shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Id*. For a criminal statute to be constitutional, it "must define the criminal offense 'with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement.'" *People v Lino*, 447 Mich 567, 575; 527 NW2d 434 (1994), quoting *Kolender v Lawson*, 461 US 352, 357; 103 S Ct 1855; 75 L Ed 2d 903 (1983). Moreover, if the general class of offenses affected by a statute "can be made constitutionally definite by a reasonable construction of the statute, [a court] is under a duty to give the statute that construction." *Harriss*, *supra* at 618.[5]

The majority's interpretation of the statute is unconstitutional for three reasons. First, the majority's interpretation of the statute does not provide an ordinary person with notice about what conduct is prohibited. MCL 257.625(8) prohibits driving with *any* amount of a schedule 1 controlled substance in a person's body. However, the majority interprets the statute in such a way as to provide no guidance to an ordinary person about *when* he can legally drive given the scientific testimony that 11-carboxy-THC can easily be found in a person's

---

[5] I note that the majority does not refer to this rule of law, instead only stating that a statute will not be struck down as vague even though doubtful cases can be imagined. See *ante* at 21. The majority's choice to ignore its mandate to reasonably construe a statute to ensure that it is constitutional is central for it to reach its decision today.

system for *weeks* after marijuana was ingested. This means that long after any possible impairment from ingesting marijuana has worn off, a person still cannot drive according to the majority's version of the statute. It also means that whether a person is deemed to have any amount of 11-carboxy-THC in his system depends on whatever cutoff standard for detection is set by the laboratory doing the testing.[6] This lacks any sort of guidance to give a person fair notice of when he can legally drive a car. Further, as explained by Dr. McCoy, as tests become more sophisticated, scientists will ultimately be able to determine if a person *ever* actively or passively ingested marijuana. Under the majority's theory, no one could legally drive a car if he *ever* inhaled marijuana. The majority states that it is "irrelevant" that a person cannot legally drive until long after any possible impairment from ingesting marijuana has worn off, even if this is weeks, months, or years. Further, the majority deems it "irrelevant" that a person cannot determine without clinical drug testing when 11-carboxy-THC can no longer be detected in a person's system. The majority believes all this is constitutional, and a person is on notice that driving may be indefinitely prohibited because ingesting marijuana is a misdemeanor. MCL 333.7404. But the penalty for ingesting marijuana under MCL 333.7404(2)(d) is "imprisonment for not more than 90 days or a fine of not more than $100.00, or both." The penalty for violating this

_____

[6] For example, cutoff standards have been reported at 100, 50, 20, and 5 nanograms. Huestis, *Cannabis (marijuana) – Effects on human behavior and performance*, 14 Forensic Sci Rev 15, 26-27 (2002).

17

misdemeanor statute is *not* being prohibited from possibly *ever* driving a car again. Thus, there is nothing in MCL 333.7404 that serves to put a person on notice that ingesting marijuana may very well mean that he cannot drive indefinitely or even permanently.

The majority's interpretation now criminalizes a broad range of conduct and makes criminals out of people who have no knowledge of the conduct that they must now seek to avoid. The majority's interpretation even makes criminals out of people who have inhaled marijuana smoke merely through passive inhalation. Dr. Evans, who testified in a hearing regarding defendant Kurts and who has worked with numerous agencies, including the United States Drug Enforcement Administration, stated, "You can get up to levels of five, eight, or ten nannograms [sic] per mil of carboxy THC in the blood by passive inhalation."[7] The prosecutor's expert in the *Derror* case, Dr. Glinn, admitted that Dr. Marilyn Huestis is one of the top experts on cannabis and its metabolites in the area of toxicology and chemistry. In an article written by Dr. Huestis, she states: "Environmental exposure to cannabis smoke can occur through passive inhalation of side-stream and exhaled smoke by non-users. Several research studies have indicated that it is possible to produce detectable concentrations of cannabinoid

_____

[7] The prosecutor in the *Kurts* case argued to the contrary at oral argument and cited an article that he stated supported his position. While this article was never admitted into the record, a review of the article indicates that it does not stand for the blanket proposition that the prosecutor argued.

18

metabolites in the urine and plasma after passive inhalation of cannabis smoke." Huestis, *Cannabis (marijuana) – Effects on human behavior and performance*, 14 Forensic Sci Rev 15, 32 (2002).

There is scientific evidence that 11-carboxy-THC can indeed get into a person's body through passive inhalation. This is contrary to the majority's assertion that 11-carboxy-THC is only present in a person's body after they have "done something illegal." *Ante* at 23. Scientific evidence of 11-carboxy-THC being present after passive inhalation means that a person who attends a concert or a gathering where someone is smoking marijuana and passively inhales this smoke will have 11-carboxy-THC in his body. With no standard in place to use as a cutoff, it does not matter what level of 11-carboxy-THC this inhalation results in because, under the majority's interpretation of the statute, it is now illegal for that person and any person who has ever ingested marijuana to drive if 11-carboxy-THC can be detected. As the trial court in the *Derror* case correctly noted, under the majority's theory, "as long as we can identify [11-]carboxy-THC in [a person's] system, apparently they can't be on the highway and, as science progresses, that could be for years."

While such an argument may at first seem far-fetched, it is the logical result of the majority's interpretation of the statute. The majority's interpretation is only limited by the scientific testing used in a particular case. If a test can detect 11-carboxy-THC from marijuana that was ingested one year ago, ten years ago, or 20 years ago, it is now a crime to drive, according to the majority.

Because of the tremendous potential for arbitrary and discriminatory enforcement in charging Michigan citizens with a crime under the majority's interpretation, the statute is unconstitutional for this second reason as well. The United States Supreme Court has recognized that a critical aspect of the vagueness doctrine is "'the requirement that a legislature establish minimal guidelines to govern law enforcement.'" *Kolender*, *supra* at 358, quoting *Smith v Goguen*, 415 US 566, 574; 94 S Ct 1242 ; 39 L Ed 2d 605 (1974). Otherwise, a criminal statute would permit enforcement on the basis of the whims of police officers and prosecutors.

The majority's belief that it is a crime to operate a vehicle with *any* amount of 11-carboxy-THC in a person's body means that a prosecutor can choose to charge a person found to have 0.01 nanograms of 11-carboxy-THC in his system if the prosecutor chooses. In the *Kurts* case, the trial court also discussed the possibility that a person could be charged weeks after ingesting marijuana, stating that "maybe you can test positive [for 11-carboxy-THC] three weeks later, but there isn't any evidence that you could be under the influence of it." The prosecutor responded that it was a question for the jury, but, "hopefully, our office wouldn't even charge such a case." But the reality is that under the majority's interpretation of the statute, a prosecutor *could* charge in that case and many others

20

because of the majority's improper interpretation of the statute, leaving Michigan citizens unsure of what conduct will be deemed criminal.[8]

Third, and finally, the majority's interpretation of the statute is unconstitutional because it is not rationally related to the objective of the statute. See *Harvey v Michigan*, 469 Mich 1, 7; 664 NW2d 767 (2003). For a statute to be deemed unconstitutional under rational-basis review, it must be shown that the legislation is "arbitrary and wholly unrelated in a rational way to the objective of the statute." *Smith v Employment Security Comm*, 410 Mich 231, 271; 301 NW2d 285 (1981).

Simply put, the statute at issue seeks to prevent a person from operating a vehicle while under the influence of drugs. But 11-carboxy-THC has no pharmacological effect on a person, and therefore cannot affect a person's driving. While 11-carboxy-THC does indicate that a person had THC in his system at *some point in the past*, there is no indication of *when* the THC was in the person's system. Dr. Glinn admitted that the levels of 11-carboxy-THC do not indicate whether the effects of the parent drug—marijuana—are still present. She stated,

---

[8] Unlike the prosecutor in the *Kurts* case, the prosecutor in the *Derror* case noted that a charge was a very real possibility, as indicated by the following exchange during a hearing. The trial court stated to the prosecutor, "[I]t seems like what you are saying now is that it's your position that we could assume hypothetically that the consumption of this marijuana had absolutely no effect, whatsoever, on this lady's driving, but the penalty should still be enhanced from two to 15 years." The prosecutor replied, "That is the position of the People, Your Honor . . . ."

"You can't correlate the levels with the effects very well." Further, *no expert* testified that a person who had ingested marijuana days and weeks ago would still be impaired. To the contrary, Dr. Glinn testified that the effects may be seen "up to 24 hours . . . ." The scientific evidence is irrefutable that 11-carboxy-THC stays in a person's system far past the point of any impairment. There is simply no rational reason to charge a person with 11-carboxy-THC in his system *weeks* after marijuana was originally ingested when a person can no longer be impaired from the effects of the marijuana.

Plainly, there is no rational reason to charge a person who passively inhaled marijuana smoke at a rock concert a month ago and who now decides to drive to work. There is no rational reason to charge a person who inhaled marijuana two weeks ago and who now decides to drive to the store to pick up a gallon of milk. While I certainly agree with the Legislature's position that a person should be punished for driving while under the influence of a controlled substance because of the potential for tragic outcomes, the majority's interpretation of the statute is arbitrary and wholly unrelated in a rational way to the objective of the statute. To say that driving while a person's system contains *any* amount of a substance that has *no pharmacological effect* is a crime—given that under the most conservative estimates offered by the prosecution, the current scientific testing can find evidence of the substance for at least four weeks—is not permissible under the Constitution. It is this Court's role to construe statutes to avoid a danger of unconstitutionality, see *Harriss*, *supra* at 618, yet today the majority has ignored

22

this longstanding principle. A reasonable construction of the statutory language is possible—for example, finding that 11-carboxy-THC may be used as *circumstantial* evidence of a statutory violation—yet the majority has chosen a position that is contrary to the Constitution and the rights of our citizens.

CONCLUSION

Because the majority interprets the statutory provisions at issue contrary to the express wording chosen by the Legislature, as well as contrary to the intent of the Legislature, I must respectfully dissent. Today's holding now makes criminals of numerous Michigan citizens who, before today, were considered law-abiding, productive members of our communities. Now, if a person has ever actively or passively ingested marijuana and drives, he drives not knowing if he is breaking the law, because if any amount of 11-carboxy-THC can be detected—no matter when it was previously ingested—he is committing a crime. The majority's interpretation, which has no rational relationship to the Legislature's genuine concerns about operating a vehicle while impaired, violates the United States Constitution and the Michigan Constitution. Therefore, I would affirm the decision of the Court of Appeals.

Michael F. Cavanagh
Elizabeth A. Weaver
Marilyn Kelly

23